J-S54038-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF H.N.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.L.S., FATHER | : | |
| | : | No. 1084 MDA 2020 |

Appeal from the Order Entered July 31, 2020
In the Court of Common Pleas of York County
Orphans' Court at No(s):  2020-0044a

BEFORE:  NICHOLS, J., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                **FILED FEBRUARY 19, 2021**

D.L.S. ("Father" or "Natural Father") appeals from the Order granting the Petition filed by S.L.B.'s ("Mother") husband, T.S.B. ("Stepfather") (collectively, "Petitioners"),[1] seeking to involuntarily terminate Father's parental rights to his minor, female child, H.N.A. ("Child") (born in February 2017), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1) and (b), so that Stepfather may adopt Child.[2]  We affirm.

_____

[1] Stepfather is the only named petitioner in the termination Petition.  However, throughout these proceedings, and in various documents, Stepfather and Mother are referred to collectively as "Petitioners."

[2] Stepfather filed a Petition for Adoption along with the termination Petition. The trial court appointed Sydney Benson, Esquire ("Attorney Benson"), as three-year-old Child's guardian *ad litem* and legal interests counsel.  Attorney Benson was present and participated in questioning the witnesses at the termination hearings in this matter.

Mother and Father were never married. Mother twice became pregnant by Father. N.T., 7/24/20, at 18-19, 26-27. Mother aborted the first pregnancy, and subsequently gave birth to Child in February 2017. N.T., 7/13/20, at 81; N.T., 7/24/20, at 31-32, 54. Prior to Child's birth, Father had sought for Mother to have an abortion. N.T., 7/13/20, at 85; N.T., 7/24/20, at 59-61. Father was living in Pennsylvania at the time of Child's birth, but moved to Texas in August 2018. N.T., 7/24/20, at 124. Father resided in Texas at the time of the hearing in this matter. *Id.* at 134.

Mother testified that in May 2017, Father had invited her to attend a concert with him, and she had accepted the invitation. N.T., 7/13/20, at 103. Mother stated that, after they reached the concert, Mother informed Father about Child, who was then three months old. *Id.* at 103-05. Mother testified that Father became angry and did not want to talk about Child. Soon thereafter, Mother contacted Father because she had heard rumors that he was moving. N.T., 7/13/20, at 105. Mother testified that Father told her that he was moving to Texas. *Id.* Mother emphasized to Father that Child lived here in Pennsylvania. *Id.* Father replied that he did not wish to be involved with Child, and Mother never heard from him regarding Child afterwards. *Id.* Mother testified that she spoke with Father four or five times, and he refused to talk about Child. *Id.* at 106. Mother had a second child, a male, with Stepfather, in December 2019. *Id.* at 107.

On March 11, 2020, Mother and Stepfather filed the Petition seeking to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b). The trial court held evidentiary hearings on the Petition on July 13, 2020, July 24, 2020, and July 29, 2020. At the conclusion of the termination hearing on July 29, 2020, the trial court terminated Father's parental rights to Child pursuant to subsections 2511(a)(1) and (b). The trial court rendered its oral Opinion on the record, which it then set forth in a separate written Opinion.[3] Father timely filed a Notice of Appeal, along with a Concise Statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father raises the following issues for review:

1. [Whether t]he [trial] court erred in finding that [F]ather evidenced a settled purpose of relinquishing his parental claim to the [C]hild and failed or refused to perform parental duties towards the [C]hild[,] when no evidence clearly established [F]ather's knowledge of the [C]hild's birth[?]

2. [Whether t]he burden of proof was inappropriately placed upon [F]ather when it was assumed that he had knowledge of the [C]hild's due date and birth[?]

3. [Whether t]he trial court's determination on credibility was erroneous, arbitrary and capricious based on the inconsistent statements by [Mother] and upon review of the evidence submitted to the [trial court?]

4. [Whether t]he trial court erred in failing to give appropriate weight and consideration to obstacles placed in the path of

---

[3] The Order terminating Father's parental rights was entered on the docket on July 31, 2020.

[F]ather which impacted his ability to exercise parental duties for the [C]hild[?]

5. [Whether t]he trial court erred in finding that the best interest of the [C]hild would be served by terminating [Father's] parental rights[?]

Father's Brief at 4.[4]

We will address Father's claims together, as they are related. First, Father challenges the trial court's conclusion that he had evidenced a settled purpose to relinquish his parental rights. *Id.* at 15. Father states that the trial court correctly determined that he was aware of Mother's pregnancy, but argues that it is unclear from the record whether he knew of Child's birth. *Id.* at 16-18. According to Father, "it would be illogical and grossly erroneous to conclude that he affirmatively abandoned or failed to perform duties that he did not know he had." *Id.* at 18. Additionally, Father points to his efforts in filing for custody and relocating to York County. *See id.* at 18-22.

In his second claim, Father argues that the trial court inappropriately placed the burden on Father by assuming that he had knowledge of Child's due date and birth. *Id.* at 22. Father claims that he and Mother had exchanged "vague" messages about the potential for an abortion. *Id.* at 23-

---

[4] Father did not raise his third issue in his Concise Statement; however, reviewing the trial court's credibility assessments is part of our standard of review, and, thus, we will address this claim. *See Krebs v. United Refining Co. of Pa.*, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that we will not ordinarily consider any issue not preserved in the statement of questions involved in an appellant's brief, and any issue not raised in a concise statement of errors complained of on appeal is waived).

24; *see also id.* at 25 (stating that "Mother was less than forthcoming in her decision to keep or about the Child").

Third, Father claims that the trial court's credibility determinations were "erroneous, arbitrary and capricious." *Id.* at 28. Father challenges the testimony of Mother's witnesses as inconsistent, misleading, or false. *See id.* at 28-41.

In his fourth claim, Father asserts that the trial court failed to give appropriate weight to the obstacles placed in his path. *Id.* at 41-42. According to Father, Mother "unfriended" him on Facebook; Mother's family members told Father to stay away from Mother; Mother changed her phone number and did not provide Father with the new one; and Mother filed for a Protection for Abuse Order from Father. *Id.* at 42-43. Father also argues that he was never informed of Child's birth. *Id.* at 43.

Finally, Father argues that the trial court erred in concluding that the termination of his parental rights would be in Child's best interest. *Id.* at 44. Father contends that the trial court placed too much emphasis on the lack of bond between him and Child. *Id.* at 45.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, … 9 A.3d 1179,

- 5 -

1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. ***Id.***; ***R.I.S.***, [36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. ***Id.***; ***see also Samuel Bassett v. Kia Motors America, Inc.***, … 34 A.3d 1, 51 (Pa. 2011); ***Christianson v. Ely***, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. ***Id.***

As we discussed in ***R.J.T.***, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012). The burden is upon the petitioner to prove, by clear and convincing evidence, that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). "The standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" ***Id.*** (quoting ***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

- 6 -

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a), along with consideration of section 2511(b).  **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).  Here, the trial court terminated Father's parental rights pursuant to subsections 2511(a)(1) and (b), which provide as follows:

> **§ 2511. Grounds for involuntary termination**
>
> (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> * * *
>
> (b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

With respect to subsection 2511(a)(1), our Supreme Court has held as follows:

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1988).

Further, this Court has stated that

the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 854-55 (Pa. Super. 2004) (citations omitted).

Regarding the definition of "parental duties," this Court has stated as

follows:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

* * *

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while

- 8 -

others provide the child with his or her physical and emotional needs.

*In re B.,N.M.*, 856 A.2d at 855 (citations omitted).

"[O]nce the statutory grounds for termination have been met under [s]ection 2511(a), the [trial] court must consider whether termination serves the needs and welfare of the child, pursuant to [s]ection 2511(b)." *In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). The focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *Id.* In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.,* 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal

citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances … where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

In its oral Opinion, stated on the record at the conclusion of the termination hearing, the trial court stated as follows regarding section 2511(a)(1):

> When I look at Subsection (a) and I look at (a)(1), … on its face there are two parts of the section that may apply, and that is whether [Father] has evidenced a settled purpose of relinquishing a parental claim to [Child] or whether he has failed to perform parental duties.
>
> With respect to the first, … the question there is whether he has a settled purpose, and that clearly indicates some level of intent.
>
> As I look at the second part about failing to perform parental duties, both of these fall back to the same factual question, and that question is whether or not [Father] knew of [Child's] birth.
>
> If the answer to that is I find that he did know about it at or before the time of her birth, then I have no choice but to terminate his parental rights, and if I find that he did not, then I think I have no choice but to not terminate his parental rights.
>
> As I go through this, again, no question here that [Father] knew [Mother] was pregnant. This is not a situation where they had a sexual encounter on spring break or something and he never knew of a pregnancy. Clearly, [Father] did know [Mother] was pregnant.
>
> Where that leaves me is now I have to decide what happened almost four years ago between [Father] and [Mother]

- 10 -

when they were were [*sic*] 20 years of age, and I have to do that based on their testimony now where they are 24 years of age.

….

However, I also have the benefit of text messages and Facebook messages and Facebook posts from that time frame that help me have a better picture into realtime [*sic*] as to what was occurring then, and what is obvious in reviewing that communication, and I do not know that anyone today would dispute, is that [Father] did not want [Mother] to give birth to [Child].

Not only is it clear that [Father] did not want her to, but it is also clear from the communication that he was pressuring [Mother] and made it clear to her that he wanted [Mother] to have an abortion. When I heard [Father] testify, he noted that some of the language he used in those text messages was inappropriate. I do not think it is sufficient to note that it was inappropriate. In reviewing the text messages, I came up with a list of words as to how he referred to [Mother] then. Forgive me, but I am going to reiterate the words that I found just in pursuing [*sic*] those text messages.

In them he called [Mother] brain-damaged, idiotic, a slut, a bitch, a liar, a spineless pussy, a three-year-old, chicken shit. He also referred to [Child] as a bastard child and a bastard fucking spawn.

Throughout his case, [Father] alleged that [Mother] was unclear about her intentions with respect to her pregnancy and whether she was going to have an abortion or carry the [C]hild to term, and [Father] testified at one point that he had received a text message from [Mother] saying she had had an abortion.

….

[] I note that there have been many, many messages produced between the parties here, and none of those messages include a text message in which [Mother] said she had an abortion or even stated clearly that she intended to have an abortion.

[Father] testified that[,] as of September 4th, 2016, there was still a thought in his mind that [Mother] may not have had an

- 11 -

abortion. Today I heard testimony that [Father] told his mother that [Mother] had, in fact, had an abortion and later learned that [Mother] did not have the abortion but never told his mother that.

In December of 2016 or January of 2017, [Father] testified that he saw the photograph that is Mother's Exhibit B-22,[5] and he said that[,] while he saw the photograph, he was unsure whether or not [Mother] was showing and appeared pregnant.

It is clear to the [trial court], based on the [c]ourt's knowledge and experience, that [Mother] is showing in that photograph, but regardless, even if I believe that [Father] did not know that [Mother] was pregnant in the photograph, right above the photograph it says ["]can't wait to welcome [Child] to the family.["]

….

I heard testimony regarding events surrounding a concert that the parties attended [sic] in May of 2017. Candidly, I found [Mother's] account of those events credible. I did not find [Father's] account of those events credible.

While [Father] testified that [he and Mother] were exchanging text messages and he really didn't care enough about [Mother] during that time frame to even respond to her text messages[,] and he testified that the only reason he asked her to go to the concert was because none of his other friends were available, again, I find that story incredible, but[,] if it is true, it also demonstrates the lengths which [Father] would go to manipulate [Mother] into doing what he wants her to do.

I do want to say the [trial court] has not heard any testimony that indicates [Father] was actually informed of [Child's] birth at or around the time of her birth. That would be February of 2017. However, the [c]ourt is convinced by clear and

---

[5] Exhibit B-22 is a photograph, posted on Facebook, of Mother, with her hands on top of her stomach, and another individual with her arms around Mother's stomach. **See** Mother's Exhibit B-22 (Facebook Photo); **see also** N.T., 7/24/20, at 77 (wherein Mother's Exhibit B was admitted into evidence during the hearing). The photograph was posted by the second individual, and the caption reads, "cant [sic] wait to welcome [Child] to the family :)".

convincing evidence that [Father] did know that [Mother] did not have an abortion. The natural result of a pregnancy that is not terminated by abortion is in most cases a birth of a child.

The [trial court] further finds by clear and convincing evidence that [Mother] informed [Father] of [Child's] birth in May of 2017 [at the time of the concert].

N.T., 7/29/20, at 57-63 (footnote added).

Further, in its Rule 1925(a) Opinion, the trial court stated as follows:

**1. Burden of Proof**

[Father] assigns error by the [trial court] claiming that the [c]ourt "plac[ed] the burden of proof upon the [] Father, rather than Petitioners." [Father] does not provide a specific reference to language used by the [c]ourt or otherwise identify the basis upon which he believes the [c]ourt placed a burden of proof upon him. To the contrary, in delivering its oral [O]pinion, and after discussing its reasoning, the [c]ourt clearly stated, "Based on the [c]ourt's findings as I have just annunciated, I have found that **the Petitioner** in this case met her burden of proof by clear and convincing evidence…." *N.T. 7/29/20, 64:4-7*[ ] (emphasis added).

The [c]ourt clearly placed the burden of proof upon Petitioners as required, and accordingly, [Father's] assignment of error on this point has no merit.

* * *

**3. Due Date of Child**

[Father] also alleges error because the [c]ourt "conclude[ed] [*sic*] … that [] Father knew the due date for the child…." Again, this cannot be error, as the [c]ourt reached no such conclusion. The [c]ourt did find credible [Mother's] testimony that about three months after Child's birth, she and [Father] were together and at this time [Mother] told [Father] Child had been born. This finding was based upon the [c]ourt's credibility determination after seeing and hearing both [Mother] and [Father] testify as to the events surrounding this meeting.

Simply stated, the [c]ourt did not find [Father's] testimony in this area credible.

Finding that [Father] knew of Child's birth three months after it occurred is not the same as a finding that he knew of the due date for Child's birth before if happened. Because the [c]ourt did not reach the conclusion [Father] assigns as error, this assignment of error lacks merit.

### 4. Settled Purpose

[Father] erroneously assigns error to this [c]ourt for "finding by clear and convincing evidence that Natural Father evidenced a settled purpose of relinquishing his parental claim to the [C]hild when there was no evidence that he was actually aware of the child's existence." (emphasis added). As with [Father's] previous claims of error, this claim has no merit. The [c]ourt found [Mother's] testimony credible, where she testified that she met with [Father] about three months after Child's birth [the May 2017 concert] and told [Father] of Child's birth. Thus, there was evidence to support the [c]ourt's finding that [Father] was aware of Child's birth, and that he was aware of her birth three months after it occurred. Thus, [Father's] claim that there is "no evidence" of record is patently false.

### 5. Obstacles

Here, [Father] claims the [c]ourt "erred in failing to give appropriate weight and consideration to obstacles placed by Petitioners in preventing [] Father from learning about the [C]hild's birth…." First, "[t]he trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, [855 A.2d 68, 73-74 (Pa. Super. 2004)]. Thus, the "appropriate weight" to give evidence lies squarely with this [c]ourt and is not subject to appellate review. Second, this claimed error, as with others, ignores the [c]ourt's finding that it found [Mother's] testimony credible and [Father's] testimony incredible regarding the events of the parties' meeting approximately three months after the Child's birth. Thus, this [c]ourt found there were no obstacles placed by [Mother], as the [c]ourt found [Mother] told [Father] of Child's birth shortly after it happened. Accordingly, this argument also has no merit.

**6. Steps by [Father]**

As with the previous claim of error, [Father's] claim of error here that "[t]he trial court gave insufficient weight and consideration to the time frame and steps taken by [] Father …" has no merit[,] as the appropriate weight to give evidence and testimony is that weight given by this [c]ourt. Regardless, the record here demonstrates that [Father] took no action whatsoever upon hearing, for the second time, of Child's existence in December of 2019. By his own testimony, [Father] spoke to [Mother] about Child <u>when she called him</u>. Only <u>after</u> [Mother] called [Father] to discuss his parental rights did [Father] take any action. Thus, the actions that were taken [were] properly weighed by the [c]ourt in determining [Father] evidenced a settled purpose of relinquishing his parental claim. Accordingly, this argument lacks any merit.

* * *

**9. Mother's Actions**

Again, the appropriate weight to give [M]other's actions is that which was given by this [c]ourt. Thus, [F]ather's claim that the [c]ourt did not give sufficient weight to [M]other's action or motivation is meritless. Further, as set forth in section seven, above, this [c]ourt must "engage in a bifurcated process prior to terminating parental rights" which consists of determining whether the parent whose rights are to [*sic*] at stake meets the criteria set forth in Section 2511(a), and only if it does, determine the best interests of the child. ***In re L.M.***, [923 A.2d 505, 511 (Pa. Super. 2007)]. Nothing in this process includes evaluating the motives behind why the petitioning party acted when it did. Nothing in this process includes examination of the petitioning parties' actions at all.

Without a doubt, after [Mother] called [Father] and spoke to him regarding Child, it became a race to the courthouse, so to speak, between [Mother] filing a [P]etition to terminate [Father's] parental rights and [Father] filing a custody action. The record demonstrates that [Mother] filed her [P]etition first, and this [c]ourt cannot consider [Father's] action after the [P]etition to terminate his rights was filed. 23 Pa.C.S.[A.] § 2511*.*

Trial Court Opinion, 9/15/20, at 2-5 (emphasis in original).

- 15 -

With regard to section 2511(b), the trial court stated as follows in its oral Opinion:

> Let me start by saying I think at this point in time, it is clear that [Father] has not established a parental bond with [Child]. I heard no evidence that he has even seen [Child] at this point.
>
> With respect to Subsection (b) and a discussion of [Child's] developmental, physical, emotional needs and her welfare, there is no bond there that would be disturbed by the termination of parental rights. In fact, to the contrary. I heard some testimony that [Child] has established a bond with [Stepfather].
>
> * * *
>
> …The [c]ourt finds that it is not necessary to make a specific finding regarding [Father's] actions of late 2019 and early 2020.
>
> While I do not need to make a specific finding about it, I will note that [Father] had what I would call a strong suspicion that [Child] was his child by the end of 2019, but he took no action on that information until February of 2020[,] when he consulted with an attorney regarding custody.
>
> The statute is clear that I am not to consider any actions taken by [Father] after the filing of a [P]etition to terminate his rights[;] [ ] the custody docket in this matter was incorporated through judicial notice, and the custody [C]omplaint in this matter was filed two days after the [P]etition to terminate his parental rights.

N.T., 7/29/20, at 57, 63-64.

Moreover, in its Rule 1925(a) Opinion, the trial court stated as follows:

**7. Best Interest**

[Father] claims this [c]ourt "erred in determining that the termination of Natural Father's rights would best serve the need[s] and welfare of the [C]hild."

….

- 16 -

Here, there was no evidence of any bond between [Father] and Child. In fact, the record demonstrates [Father] had not so much as seen Child as of the time of the hearing. Though [Father] assigns it as error below, the record shows Child views [Stepfather] as her father. The import of this evidence is that the effect on Child by terminating [Father's] parental rights is minimal, if any at all. Child has not met [Father] and views her [Stepfather] as her father. Thus, it may be more disruptive to introduce [Father] into Child's life at this age then [*sic*] to terminate [Father's] parental rights because there was no bond between [Father] and Child, but [there] is a parental bond between Child and [Stepfather].

### 8. Bond of [**Stepfather**]

As with sections five and six, above, the appropriate weight of the bond between Child and [Stepfather] is within the sound discretion of this [c]ourt. Notwithstanding, as outlined in section seven, above, this [c]ourt is charged with evaluating "the effect on the child of permanently severing any such bond" between Child and [Father]. In evaluating the effect on Child, it is appropriate to also look to [with] whom Child has any fatherly relationship. Otherwise, it would be impossible to fully evaluate how the termination of, in this case, [Father's] rights would affect Child. Thus, the [c]ourt properly heard and considered limited evidence as to Child's relationship with [Stepfather]. Accordingly, [Father's] claim of error on this point has no merit.

Trial Court Opinion, 9/15/20, at 6-7.

The record supports the trial court determination that Father had failed to perform his parental duties and displayed settled purpose of relinquishing his parental claim with regard to Child. The trial court also considered the lack of any post-abandonment contact between Father and Child. The trial court did not believe that Father's lack of contact was because Petitioners had placed obstacles between Father and Child, as claimed by Father, but rather, because of Father's lack of desire to be a father.

Additionally, the trial court appropriately considered the effect of termination of parental rights on the child pursuant to section 2511(b). **See In re Adoption of Charles E.D.M.**, 708 A.2d at 92. In this matter, Father had never met Child by his own choice, despite Mother providing Father an opportunity to be involved in Child's life. Therefore, the trial court did not abuse its discretion or commit an error of law in determining that no bond existed between Child and Father, and that there was a parent-child bond between Child and Stepfather.

Thus, there was competent evidence in the record from which the trial court could conclude that Mother and Stepfather had met, by clear and convincing evidence, the requirements of sections 2511(a)(1) and (b). Moreover, regarding Father's challenges to the trial court's credibility determinations, we reiterate that this Court will not reassess credibility determinations that are supported by the record. **See In re Adoption of S.P.**, **supra**. As set forth above, the trial court's credibility determinations are supported by the record. Discern no abuse of the trial court's discretion or error of law in the trial court's legal conclusions, we affirm the trial court's Order terminating Father's parental rights.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>02/19/2021</u>